SHAW STOCKING CO. v. WEIERMAN & SARFERT.

(Circuit Court, E. D. Pennsylvania. June 6, 1907.)

No. 10, October Session, 1904.

PATENTS—VALIDITY AND INFRINGEMENT—STOCKING.

The Shaw patent, No. 460,037, for an improved stocking and method of making the same, the product being a split-foot seamless stocking having the top and bottom of the foot knit of different yarns and the edges of the parts joined by interlooping stiches, was not anticipated, and discloses novelty and patentable invention; also *held* infringed.

In Equity. Suit for infringement of letters patent No. 460,037, for an improved stocking and method of making the same, granted to B. F. Shaw September 22, 1891. On final hearing.

A. D. Salinger and W. K. Richardson, for complainant.
Henry N. Paul, Jr., and Joseph C. Fraley, for defendants.

ARCHBALD, District Judge.[1] The patent in suit is for a stocking of a certain designated structure, produced, as it is said, by a novel method of knitting; the claim which is relied on being as follows:

"2. A stocking having the top or upper part of its foot composed of one yarn or set of yarns and the bottom or sole part of the foot composed of another and distinct yarn or set of yarns, the said upper and sole parts being united in the form of a tube by the reciprocal interloopment of the loops of the opposed edges of said upper and sole at the sides of the foot, substantially as described."

The usual defenses are made that the device has been anticipated and that it is not infringed. It is also suggested that there is nothing patentably inventive in it, but apparently not with the same confidence.

Among the things to be desired in a stocking is that it shall be seamless, so as to avoid a ridge or wale to press upon and chafe the foot. This is easy to arrange by hand, but no machine has yet been devised to do so; the best that can be accomplished being to reduce the seam to a minimum. Machine-made stockings, therefore, are either knit in a flat web, the edges of which are afterwards sewed or crocheted together their full length; or in a tube with pouches or pockets at proper distances for heels and toes, the tube being cut into lengths and sewed in various ways; or, sometimes, as in the "English cut" stocking, there is a straight tube, without more, reliance being had for the heels and toes on the way it is cut and sewed. The advantage of a flat web is that it can be shaped to conform to the leg or foot, and the finest grade of imported German or French foot stock-

[2] Specially assigned.

ings are so made. But the seam is harsh to the feet, and they are also expensive to make on account of the hand labor involved, so that stockings from tubes are the most general.

Another desirable feature is that the sole of the stocking shall be undyed. At first it was merely the heel and toe that were made this way, being so knit by our grandmothers. But of late years the idea has been extended to the entire bottom, and hence the so-called split-foot effect, in which the top or upper part of the foot is of one color or character, and the sole of another; the latter being also sometimes reinforced or made heavier. This style came into vogue somewhere about 1884, and has grown in favor until the demand is almost beyond the supply. To many people it may not matter; but to some, with sensitive feet, a full-dyed stocking is almost unendurable. The wear on the bottom of the foot being also the greatest, an unbleached sole is not only nonirritant or sanitary, but more durable. It so happens, also, that those with tender feet, who want an undyed sole, for the same reason are disturbed by a seam, and hence it has been found desirable to combine the two features. This has been done by the device in suit, making possible, as it is claimed, what was not possible before, a practically seamless, split-foot stocking. It is accomplished by having the top of the foot knit of one yarn or set of yarns, and the bottom of another, each being separate and distinct, and carried along, independently of the other, on its own set of needles, the edges of the two webs at the same time being interlooped and fastened together, as they are knit, by intermediate suture or seaming needles, arranged for the purpose, completing the tube. It is this special structural character, and the possibilities growing out of it, as it is claimed, that constitute the invention.

The first question is as to its novelty. As already stated, the seamless idea was not new, being suggested by the same inventor in an earlier patent (1867), and long since adopted and developed in various ways. Neither was the split foot, whether confined to an undyed sole, as understood in the trade, or including everything in which the sole and upper are different. But the same cannot be said of the two together, which combination, whatever the previous possibilities, is not to be directly found in any of the references cited. The German or French foot stocking, for instance, while as early as 1886 showing a split-foot structure—consisting of a flat web, made up of three strips, the center being black or colored and the two sides white, with the edges knit together by sutures—had still to be sewed the same as ever down the back of the leg and along the middle of the sole, making it far from seamless. Neither is there anything of the kind in the Bickford (1872) patent. By the method which is there described the leg of the stocking is knit in the usual manner until the lower part of the calf is reached, from which point it proceeds as a flat web down to the ankle, when it is again knit as a tube until it comes to the heel and foot, where one half of the needles, more or less, are thrown out, and the other half, carrying the front or upper part of the foot, knit on, back and forth, until the top of the foot is complete. There is then a narrowing and a widening for the toe, after which the sole is knit, in the same way and with the same needles as the upper, ex-

cept that the selvage loops of the latter are picked up, with each recip-rocation, and knit or interlocked with the web which is being formed, so as to join top and bottom together. Just before the heel is reached, there is a slight widening to make a gore and get a better fit about the ankle, following which there is the usual narrowing and widening for the heel, which finishes the operation. An edge at the top of the heel, corresponding with a similar edge at the unfinished end of the back half of the leg, having been left open in the process, the two are brought together by hand, and the stocking is complete. As must be reasonably evident, saving that both are seamless, there is nothing in common in this, either in structure or method, with the complainants' stocking. It is true that, by changing the yarn at the toe, the sole may be given a different cast from the top of the foot, an undyed yarn being introduced where that is the effect to be produced, or a heavier yarn where a reinforced sole is wanted. And there are thus apparently much the same possibilities in it as in that of the complainants' stocking, which is the point, of course, for which it is cited. But the difficulty is that it is only as we supply and import something from without that this can be said of it, whatever of the kind there is there being latent and undeveloped. Bickford plainly had nothing in mind beyond the production of a form of so-called seamless stocking, particular stress being laid upon the method of uniting the selvage edges of the top with the sole, as knit; and, taking it as it stands, that is all that can be made out of it. This, as he says, he effects "without any separate binding yarn or any seaming device other than the needles"; "the entire seamed goods, including its seam," as he is careful to add, being made "from a single unbroken yarn." There is no hint in this of any change of yarns at any point, or of two different and distinct yarns or sets of yarns, one for the top of the foot and the other for the bottom, according to the possibilities now claimed for it, corresponding with the patent. And, on the contrary, this is distinctly negatived; the asserted virtue of the process consisting in the use of a single thread of yarn for top and bottom, knit on the same set of needles, throughout.

Neither, as it is to be observed, would a change of yarn at the toe bring the case within the present patent; a mere substitution such as this, even though there is a change in the character of the yarn, not making them separate yarns, the one, from the knitting standpoint, being nothing more than a continuation of the other, constituting but a single strand. The fact is that, having different objects in view, the two proceed upon an entirely different and distinct basis; the one being essentially a one-thread method and product, where the other, just to the contrary, is a two-thread, each being worked out along correspondingly different lines. Notwithstanding some possible vagaries found in the patent, there can be no question that Shaw had in mind a split-foot, as well as a seamless, stocking; not necessarily an undyed sole in conjunction with a colored upper, which is only one form, but any similar beneficial combination, by which the top and the sole are made different, which the use of a separate yarn or set of yarns for each, knit on a separate half of the needles, with the interlooping together of the two, which is provided for, makes possible. This Bick-

ford never thought of, and does not show. All that his method .was directed to being the production of a seamless stocking, it is not to be wrested out of its place in the art by what we now happen to know on the subject.

The Dorman (1887) is the only other reference cited. This is a British patent, and at the best is vague; on the strength of which it might probably be entirely disregarded. Hanifen v. Armitage, 117 Fed. 845. Rightly considered, however, it does not conflict with the patent in suit; there being nothing either of the seamless or the split-foot idea to be found in it. In terms it is for a circular knitting machine for the manufacture, among other things, of stockings. Its chief virtue consists in its divided or sectional cam shells, of which there are two, with two sets of needles, a longer and a shorter; the one being actuated by the cams in the upper shell, and the other by those in the lower. When a plain web is to be knit, either of glove or stocking, the two cam shells are so arranged that the corresponding cams are in a vertical line. Being set opposite to each other by a half revolution of the cam shells, and a separate yarn supplied to the short needles, tucked or fancy knitting may be produced. So, also, with the cams in this relative position, a splicing or reinforcement of the fabric with an extra thread may be effected at certain desired points, such as the knees, heels, or toes of a stocking. It is over what is said in this connection that the controversy arises. It is cleared up somewhat by a comparison of the provisional with the complete specifications, but is involved in no great difficulty, if it be kept in mind that the splicing portion is what is being referred to. "I place at the back of the machine," says the inventor, "a number of needles of one kind, say short ones, * * * . corresponding with the width of that part of the fabric that is to be spliced or reinforced. On either side of these short needles, I place a long needle, * * * which has, in addition to its butt, L, another butt, M, higher up, and the same distance from the hook as the butts of the shorter needles. * * * The remaining grooves of the cylinder * * * are filled with the long needles. * * * Now, when the two cam shells * * * are so arranged and secured relatively to each other that the corresponding cams * * * are in a vertical line, plain or ribbed web will be knitted, and the heel and the toe may be formed as usual"— that is to say, without any splicing; not, as contended by the defendants, by narrowing and widening to make pockets, which evidently is not in the mind of the inventor, if, indeed, it comports, as it does not, with the process which he is explaining, with which it is distinctly contrasted in what follows. "If, however, the upper cam shell," as he continues, "is adjusted opposite to the lower cam shell, * * * as explained above, and a thicker yarn, or the usual yarn with an additional splicing yarn, is fed by the separate yarn guide * * * to the shorter needles, * * * and a reciprocating motion is given to the cam shells, as when knitting heels and toes * * * a tubular web will be knitted, one part of which will be spliced, and the other not. The two needles, * * * with double butts, which are placed at either side, will take the yarn from both yarn guides * * * at each reciprocation, and consequently will firmly unite and seam to-

gether the spliced and the unspliced portions. When the spliced portion is finished, the upper cam shell * * * receives a partial revolution, so as to bring the corresponding cams in the two cam shells in a vertical line with each other, the yarn or yarns are removed from the auxiliary yarn carrier, * * * and cut off, and the knitting proceeds as usual."

The claims of the patent are to be read in the light of this description, and have no separate significance. The effect of it all is simply this: That, when the point is reached where a splicing or reinforcing of the fabric is desired, the needles and cam shells, instead of being arranged for straight tubular knitting, are divided into two sets or sections, one supplied with the regular yarn, and the other with one that is reinforced or heavier, each of which is knit into a distinct web, the two being united into a tube by the long, end needles at either edge, operating as suture or seaming needles, which, having two butts, are actuated in turn by both sets of cams, and so at each reciprocation catch and interloop the two yarns. No doubt there is here, the same as in the complainants' stocking, two separate and distinct yarns, one of which is knit into one strip of webbing, and the other into another, the two being united at their edges by the suture needles, as the courses are laid, and together going to form a complete tube, to be subsequently cut up and made into stockings. If it could be shown that there was at the same time a fashioning of heels and toes, it may be, as argued, that the structure of the patent would be realized and the invention anticipated, although this would have to be carefully considered before being finally conceded. But clearly that is not the case. On the contrary, upon an analysis of the process, it will be found to be absolutely opposed to any such idea. Only in straight knitting are the suture needles operative, their sole function being to unite the two strips of webbing formed by the others, and if heels and toes were attempted they would necessarily for the time being have to be thrown out and remain idle. While, therefore, this fashioning was going on with the reinforced or spliced yarn, the short needles to which it was fed would be the only ones in operation, and when the heel and toe pouches were completed this yarn would be cut off, and straight knitting with a single yarn be resumed, when the suture needles would not be needed. In other words, although designed to unite and knit together the spliced and unspliced portions, and provided with a double butt for that purpose, they would be thrown out of operation, and remain so, at the only time when they could be of this service, making them an entirely useless appendage.

We are not to be drawn, of course, into any such absurdity. Evidently the production of a straight tube, such as that out of which the ordinary English cut stocking is made, with which the inventor was no doubt familiar, was what was intended, reinforced at desired points by a spliced or heavier yarn; the splicing operation being accomplished, as explained, without a special splicing apparatus, as the point of the invention. It is said, however, that the needles shown in the drawings are grooved, the only purpose of which is to enable them to be held at the idle level in fashioning, which is thus implied as a part of the process. But this cannot be regarded as of controlling

significance. All needles are made that way, as I understand it, and these were probably so represented, in consequence. At all events, this circumstance is not enough of itself to overcome the force of what has been alluded to. It is also suggested that the making of heels and toes, being a matter of common knowledge, and this being all the advance at the best that was made over Dorman, it involved no invention to supply it. But this by no means states the whole situation. There was much to be done besides simply supplying heels and toes, before a split-foot seamless stocking, such as we have here, was either possible or suggested. Certainly neither of these features is anywhere directly disclosed in it; the spliced portion in no sense being split-foot, and the seaming together of the two webs at the reinforced points not making it seamless. The most that can be said is that there were rudiments, which as we now know were perhaps capable of development. It may be that such a stocking, for instance, could be knit by the Dorman machine, the divided or sectional cams admitting of possibilities, which, it is argued, go beyond anything that we have here. But not by his method, nor without manipulation, if not adaptive changes; which falls far short of realizing the conception, or depriving it of the merit of invention.

The most serious arraignment of the patent, or at least the one that has given me the most difficulty, although little argued, is that, outside of the method specified, it shows nothing patentably inventive. There was no originality, according to this, in a stocking without a seam; nor yet in one with the top of the foot of one color or character and the bottom of another; and it required no inventive genius to appreciate the desirability of bringing them together. Neither are the possibilities residing in the combination available to help make out invention; having regard to which the device would not seem to be patentable. But the fallacy of this lies in assuming that it is the idea which is patented, rather than the particular form by which it is realized, to which the position taken by counsel may perhaps have contributed. The claim is not to be construed, in other words, as covering every split-foot seamless stocking—monopolizing the whole field and discouraging inventive effort, which it is the object of the law to foster—but only the one there specified. The object of the invention, as stated in the patent, was "the production of a novel stocking by a novel method of knitting," from which, indeed, it is not to be separated. Granting, however, that a stocking of this character was known to be desirable, the thing was to produce it. Difficulties had been experienced, and considerable ingenuity exercised, to make one that was seamless; and the best that had been done in the way of an undyed sole was the German or French foot, where the seam was at a maximum. It was in this state of the art that the present invention was projected into it; Shaw being apparently the first to successfully master the problem. "Knit the top of the foot of one yarn," was his solution, "and the bottom of another, interlooping the edges." This may seem simple, but is not on that account to be rejected. The way it has been received, as well as the imitations which have sprung up, show that it was effective. Nor can it be said that the inventor did not appreciate what he had achieved, or disclose what is now claimed

for it. The seamless effect is expressly mentioned, and the difference of yarns, as well as the method of knitting, necessarily brought about a divided or split-foot structure. Nor did the accruing advantages have to be named in order to get the benefit of them. The only thing is that Shaw's solution is not exclusive. There may be others available of equal value. If the Bickford, for instance, can be utilized for the purpose, and an undyed sole, as well as a seamless foot, be made out of it, by changing the yarn at the toe, there would seem to be nothing against this. Other means may occur to others. But let each work out his own, and not appropriate the ideas of others, the difficulty of which may help to convince that it requires invention.

The patent being sustained, the question of infringement is not serious. It depends upon the asserted difference of the interloopment. The intermediate suggestion, that the complainants make the front and back of the leg, as well as the corresponding parts of the foot, of separate yarns, while the defendants do not divide until the foot is reached, is not material. It is only the foot that concerns us, the structure of that being all that is the subject of the claim, with which the fact that a split leg, as well as foot, may be produced by the method and appliances shown in the patent, is not at variance. Neither can this be said to separate inseparable parts, or establish metaphysical distinctions; the stocking, as it is contended, having to be taken as a whole, as to which, if there is a difference, there is no infringement. There is no such separation of constituent parts, assuming that this would be objectionable. A stocking is what is declared for in the claim, with a foot of a certain structural character, as the feature patented, and if this has been appropriated there is an infringement of the invention, even though in other respects there may be a difference. Neither do we need to stop long over the suggestion, already touched upon, that the patent is not for a split-foot, seamless stocking, as it is understood in the trade; that is to say, for an undyed sole with a colored upper, which is the only form of divided foot, as it is said, of any commercial value, with which the inventor is therefore not to be credited. But, as pointed out above, the invention is broad enough to cover this, which is all that is material. An undyed sole may be the form of greatest utility, and thus enjoy the largest commercial favor; but this does not take it out of the terms of the patent, nor is it any less an infringement because it may not have been specified.

It is said, however, that the inventor is expressly committed to a "reciprocal interloopment of the loops of the opposing edges" of sole and upper, consisting, as described in the specifications, in alternately drawing a loop of the one yarn through a loop of the other; contrast being made, by way of emphasis, not only with the sewing or crocheting together of the edges, as in the English cut or German stocking, but also, by obvious reference, with the Bickford, in which the loops of the sole, as they are knit, are drawn through the loops of the completed or selvage edges of the upper, producing a different character of wale, as well as one that is different looking. But, while this is all so, and the particular method of interloopment described under the designation of "reciprocal" is carried into the claim by express mention, it is plainly not of the substance of the invention, nor essential

to its novelty, and only by the narrowest and most literal construction, and the disallowance of all equivalents, is it to be so restricted. The only difference in the method pursued by the defendants from that of the complainants is that in the one the suture needles knit with each yarn alternately, drawing a loop of the one through a loop of the other, while in the other they knit each with its own yarn in the field of the other, into which they are respectively transposed, the needle for the white yarn being made to knit in the black field and the black needle in the white field at each reciprocation. That there is an interloopment of the two yarns as the result is clear. It is so spoken of in the Pigeon patent, which the defendants follow, where the method pursued by Shaw is suggested as a possible substitute, recognizing the two as interchangeable, and thus equivalent. Defendants' expert also admits that, in a generic sense, there is an interloopment; the only distinction which he attempts being that, within the meaning given to it in the patent, it is not reciprocal. But to hang on the form of a stitch in this way is virtually to confess infringement; and even in a so-called dead structure, such as a stocking, there is a right to a certain measure of equivalents. And while it may be true that there is not, in strictness, a drawing of a loop of the one yarn through a loop of the other in the defendants' process, there certainly is an intermeshing of the two threads, each of which in turn passes in front and then at the back of the other; an intermediate, if not a selvage, loop of the one yarn, thus, as the result, interlocking with a similar loop of the other, alternately or reciprocally, fulfilling the patent.

The patent is therefore sustained, and found to be infringed, and an injunction is directed to issue, the case being referred to a master to take an account, with costs.